**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KIMMY DENG and EKATERINA KIM, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>KUDOS INNOVATIONS, INC.,<br><br>               Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kimmy Deng and Ekaterina Kim ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Kudos ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased Defendant's "Ultimate Diaper" (the "Product"), which are unfit for their intended use because they contain unsafe per- and polyfluoroalkyl substances ("PFAS"). The Products are formulated, designed, manufactured, advertised, distributed, and sold by Defendant or its agents to consumers, including Plaintiffs, across the United States.

2. PFAS are a group of synthetic chemicals known to be harmful to children. Because PFAS persist and accumulate over time, they are harmful even at very low levels.

1

Indeed, PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers.[1]

3.     Furthermore, the Centers for Disease Control and Prevention ("CDC") outlined a host of health effects associated with PFAS exposure, including liver damage, decreased fertility, and increased risk of asthma.[2]

4.     Despite Defendant's representations to consumers that its Product is "the safest diaper for baby's sensitive skin [and] the planet" and composed of "plant-based materials," including on its website, independent research conducted by Plaintiffs' counsel, utilizing a Department of Defense ELAP-certified laboratory, revealed that the Product contains 1.8 parts per billion PFAS.

5.     Accordingly, Plaintiffs bring claims against Defendant individually and on behalf of a class of all others similarly situated for (1) Violation of the Massachusetts Unfair and Deceptive Business Practices Act: (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (3) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; (5) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*; and California Commercial Code § 2314; (6) Fraud; (7) Fraudulent Concealment or Omission; (8) Negligent Misrepresentation; (9) Unjust Enrichment; (10) Breach of Express Warranty; and (11) Negligent Failure to Warn.

---

[1] *See* Alan D. Woolf, M.D., M.P.H., FAAP, & Lauren Zajac, M.D., M.P.H., FAAP., *Report Outlines Health Effects of PFAS Chemicals in Children, Provides Recommendations for Testing*, AM. ACAD. OF PEDIATRICS (Sept. 13, 2022), https://publications.aap.org/aapnews/news/22138/Report-outlines-health-effects-of-PFAS-chemicals?autologincheck=redirected.

[2] *What are the Health Effects of PFAS?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (Jan. 18, 2024), https://www.atsdr.cdc.gov/pfas/health-effects/index.html.

## PARTIES

6.      Plaintiff Kimmy Deng is a California citizen and resident of San Francisco. Plaintiff Deng has a 7-month-old daughter.  As recently as October 2, 2023, Plaintiff Deng purchased Kudos' "Ultimate Diaper" from Defendant's website.  Prior to her purchase of the Product, Plaintiff Deng reviewed the Product's labeling and packaging and saw that the Product was labeled and marketed as made from "natural ingredients" and "plant-based materials" such that the Product is toxin-free and therefore safe for infants and toddlers.  Plaintiff Deng saw these representations prior to and at the time of purchase and understood them as representations and warranties that the Product was suitable as a safe diaper for infants and toddlers, like her own. Plaintiff Deng relied on these representations and warranties in deciding to purchase the Product. Accordingly, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known those representations were not true.  In making her purchase, Plaintiff Deng paid a price premium due to the false and misleading claim that the product is suitable as a safe daily diaper for infants and toddlers.  Had Plaintiff Deng known that the claims that the Product is toxin-free and therefore safe for her child were false and misleading, Plaintiff Deng would not have purchased the Product or would have purchased it under substantially different terms.  Plaintiff Deng did not receive the benefit of her bargain because the Product was not, in fact, safe for use as a daily diaper for infants and toddlers because of its inclusion of PFAS chemicals.

7.      Plaintiff Deng remains interested in purchasing the Product from Defendant. However, she is unable to determine if the Product is actually safe for her children.  She understands that the composition of the Product may change over time, but as long as Defendant continues to represent its Product as safe for infants and toddlers by virtue of its natural

representations, then, when presented with false or misleading information while shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitors' products. Plaintiff Deng is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Product's marketing as "natural" and therefore safe to wear, is, in fact, safe for wear by infants and toddlers.

8.     Plaintiff Ekaterina Kim is a Massachusetts citizen who is a resident of Somerville. Plaintiff Kim has a 3-month-old son. Plaintiff Kim purchased a monthly subscription for the "Ultimate Diaper" as recently as December 16, 2023, from Defendant's website. Prior to her purchase of the Product, Plaintiff Kim reviewed the Product's labeling and packaging and saw that the Product was labeled and marketed as made from "natural ingredients" and "plant-based materials" such that the Product is safe for infants and toddlers. Plaintiff Kim saw these representations prior to and at the time of purchase, and understood them as representations and warranties that the Product was suitable as a safe diaper for infants and toddlers, including her son. Plaintiff Kim relied on these representations and warranties in deciding to purchase the Product. Accordingly, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known those representations were not true. In making her purchase, Plaintiff Kim paid a substantial price premium due to the false and misleading claim that the product is suitable as a safe daily diaper for infants and toddlers. Had Plaintiff Kim known that the claims that the Product is safe for her child were false and misleading, Plaintiff Kim would not have purchased the Product or would have purchased it under substantially different terms. She did not receive the benefit of her

bargain because the Product was not, in fact, suitable for use as a safe daily diaper for infants and toddlers because of its inclusion of PFAS chemicals.

9.     Plaintiff Kim remains interested in purchasing the Product from Defendant. However, Plaintiff Kim is unable to determine if the Product is actually safe for her son. Plaintiff Kim understands that the composition of the Product may change over time, but as long as Defendant continues to represent its Product as "natural" and thus toxin-free for infants and toddlers, then, when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitors' products. Plaintiff Kim is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Product's marketing as "natural" and therefore safe to wear, is, in fact, safe for wear by infants and toddlers.

10.     Defendant Kudos Innovations is a corporation, with its principal place of business in Boston, Massachusetts.  Defendant markets, sells, and distributes the Product throughout the contiguous United States, including in California and Massachusetts.  Defendant manufactured, marketed, and sold the Products at issue at all times during the relevant class period.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class Members, the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different than Defendant.

12.     Defendant is a corporation under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), and therefore a citizen of Massachusetts because Defendant has

its principal place of business at 6 Liberty Square #551, Boston, Massachusetts 02109. Massachusetts is the state where it has its principal place of business.

13.     This Court has personal jurisdiction over Defendant because Defendant is at home in this District, purposefully availed itself to the benefits of the forum, and because a substantial portion of the events giving rise to this complaint occurred in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because this District is where a substantial part of the conduct giving rise to Plaintiffs' claims occurred and where Defendant is at home.

## FACTUAL ALLEGATIONS

### I.      The Product and Defendant's Marketing

15.     Defendant markets and sells "The Ultimate Diaper." The brand and product are uniquely positioned for its use of "plant based materials."[3]  As such, Defendant markets "The Ultimate Diaper" as safe and better than other diapers for the health of infants and toddlers, thus appealing to the health-conscious parent.[4]  In fact, Kudos knows "how important it is that you trust what's touching your baby's skin (that's why we created Kudos in the first place!)."[5]

16.     Defendant impresses its natural and safe messaging onto consumers by leveraging plant art above affirmative claims of safety prominently on the Product's page:

---

[3] Kudos, https://mykudos.com/ (Last accessed March 6, 2024).

[4] *The Ultimate Diaper*, Kudos, https://mykudos.com/products/diaper (last accessed Feb. 23, 2024).

[5] Kudos, *Kudos Diapers Test Negative for PFAS,* (Dec. 11, 2023) available https://mykudos.com/blogs/news/kudos-diapers-pfas-free (last accessed Mar. 3, 2024).



17.     Kudos is aware that its "natural" messaging is both good for business and resonating with consumers as it prominently displays testimonials from its consumers joyfully celebrating their purchase of a diaper free of harmful contaminants:[6]



---

[6] *Id.*

18.     Such marketing underscores Defendant's marketing claiming that the Product is "the safest diaper for [a] baby's sensitive skin, [and] the planet."[7]

19.     In fact, Defendant's promotion of its Product follows a larger industry trend of meeting parents' desires for natural, toxic-free baby products as "[g]rowing concerns about infant health are driving the market for baby care products."[8]   Accordingly, because "[c]hemicals can occasionally be found in … diapers … there is a rise in consumer demand for organic baby care products."[9]

20.     Seeking to address consumer concerns surrounding the use of synthetic chemicals in diapers, Kudos has placed chemical free claims at the forefront of its marketing campaign.  In fact, Kudos prominently markets on its website that the Product appealed to "Shark Tank" investors because of its "chemical-free nature."[10]

21.     Kudos also differentiates itself from competitors' use of chemical-hosting fibers: "Most bamboo fabric is actually rayon, a fiber produced through a caustic chemical process that throws environmentally toxic carbon disulfide (can cause psychosis and lung disease) and hydrogen sulfide (can impact reproductive and eye health) into the environment."[11]

---

[7] *Id.*

[8] Mordor Intelligence, *Baby Care Products Market Size & Share Analysis – Growth Trends & Forecasts (2024-2029)*, available https://www.mordorintelligence.com/industry-reports/baby-care-products-market (last accessed Mar. 2, 2024).

[9] *Id.*

[10] Megan Sauer, *Engineer Saw How Diapers Were Made, Thought She Could Do Better—Now She Has A $250,000 'Shark Tank' Deal*, CNBC (Jan. 11, 2023), https://www.cnbc.com/2023/01/10/shark-tank-amrita-saigal-kudos-founder-lands-deal-for-diapers.html.

[11] Kudos, *supra* note 4.



*Figure 5*

22.     Unfortunately, Defendant's capitalizing on growing desires for non-toxic baby products has left consumers like Plaintiffs unaware that Defendant's diapers contain harmful, toxic, PFAS chemicals.

23.     Plaintiffs viewed Defendant's marketing materials and campaign before making their purchases.  In so doing, they relied on Defendant's representations, warranties, and omissions in purchasing the Product.

## II.     PFAS in Defendant's Products.

24.     Defendant's Product poses a health and safety risk to children due to the presence of PFAS in the Product.

25.     In December 2023, Kudos issued a press release on its website claiming its size 4 "Ultimate Diaper" tested negative for PFAS.[12]  However, although Kudos warranted to consumers that its size 4 diapers—and by extension *all* of its products since its "diapers [] are

---

[12] *See* Kudos, *supra* note 5.

made with the exact same materials and at the same facility as all of [its] diapers,"[13] are PFAS-free, Plaintiffs' January 2024 test results show that statement is not true.

26.     Indeed, a Department of Defense ELAP-certified laboratory—commissioned by Plaintiffs' Counsel—tested the Product and found that the Product contained 1.8 parts per billion (PPB) of PFAS.

27.     Thus, contrary to Defendant's representations that the Product is made from "natural" plant-based material and PFAS-free, PFAS are prevalent in the Product thereby making it unsafe for infants and babies.

28.     Defendant, as the marketer, manufacturer, and producer of the Product, knew or should have known about the presence of such PFAS in its Product when making its natural and plant-based representations.

29.     Instead, Defendant chose not to disclose the PFAS-content of its Product, and instead affirmatively denied its presence and concealed this information from health-conscious consumers looking to purchase a Product that is safe to use for their newborns and babies.  No reasonable consumer, purchasing diapers for their babies, marketed as made with natural, plant-based material for a baby's sensitive skin, would expect that product to also have high levels of highly toxic PFAS chemicals.

30.     Alarmingly, PFAS are particularly problematic to human health—and young children especially—as PFAS exposure to sensitive skin can cause toxic PFAS chemicals to remain in the body for years after exposure.  PFAS exposure has been linked to severe health consequences.

---

[13] *Id.*

### III.   PFAS Chemicals Are Harmful to Babies and Infants

31.     PFAS chemicals "are man-made chemicals that have been used in industry and consumer products worldwide since the 1940s.  They have been used to make nonstick cookware, water-repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."[14]

32.     PFAS are often divided into two groups: long chain and short chain, both of which break down slowly, if at all.[15]  In fact, long chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks.[16]  Regardless of length, research from the U.S. National Toxicology Program suggests that both long chain and short chain PFAS have similar levels of toxicity.[17]

33.     PFAS chemicals have been connected with severe and lingering health consequences.  Erika Schreder, Director of Science at Toxic-Free Future, and Jennifer Dickman, Senior Program Associate of Safer Chemicals, Healthy Families, have explained that [p]rimary

---

[14] Agency for Toxic Substances and Disease Registry, *Per= and Polyfluoroalkyl Substances (PFAS) and Your Health,* U.S. DEP'T OF HEALTH AND HUM. SERVS. (Jan. 18, 2024) *available* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html#:~:text=They%20have%20been%20used%20to,grease%2C%20water%2 C%20and%20oil. (last accessed Mar. 4, 2024).

[15] National Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalky Substances*, U.S. DEP'T OF HEALTH AND HUM. SERVS. (Dec. 4, 2023), https://www.niehs.nih.gov/health/topics/agents/pfc. (last accessed Mar. 11, 2024).

[16] *Per- and Polyfluoroalkyl Substance (PFAS)*, AM. WATER WORKS ASS'N (Aug. 12, 2019), https://www.awwa.org/Portals/0/AWWA/ETS/Resources/Per-andPolyfluoroalkylSubstances(PFAS)-OverviewandPrevalence.pdf?ver=2019-08-14-090234-873. (last accessed Mar. 12, 2024).

[17] Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, NAT'L INST. OF HEALTH (Jan. 8, 2024), https://ntp.niehs.nih.gov/whatwestudy/topics/pfas (last accessed Mar. 12, 2024).

among [PFAS-linked health concerns] are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."[18]

34.    Similarly, Dr. Lina S. Birnbaum, Scholar in Residence at Duke University, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences (NIEH) and National Toxicology Program, stated that "[t]hese toxic chemicals are linked to serious problems like cancer, liver damage, decreased fertility, and asthma. … PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."[19]

35.    Additionally, in children, PFAS has also been linked to "[l]ower antibody response[s] to some vaccines,"[20] thereby rendering children more vulnerable to disease they would otherwise be immune from.

36.    Defendant is correct: babies have sensitive skin.  "A newborn's skin is significantly thinner and more permeable than that of an adult and can more readily absorb chemicals."[21]  Not surprisingly then, the American Academy of Pediatrics confirm that "[c]hildren are more vulnerable to environmental pollutants like PFAS than adults because of … lower body weight, differences in water and food intake, developing organ systems and longer

---

[18] Erika Schreder and Jennifer Dickman, *Take Out Toxics: PFAS Chemicals In Food Packaging* 1-26, 6 (2019), TOXIC FREE FUTURE, *available*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://toxicfreefuture.org/wp-content/uploads/2019/05/Take-Out-Toxics-Full-Report.pdf. (last accessed Mar. 12, 2024).

[19] *New Study Indicates Toxic Chemicals Used In Take-Out Food Packaging From Popular Food Chains*, ECOLOGY CTR., https://www.ecocenter.org/new-study-indicates-toxic-chemicals-used-take-out-food-packaging-popular-food-chains (last accessed Feb. 23, 2024).

[20] *EGLE Classroom: Introduction to PFAS*, MICH. PFAS ACTION RESPONSE TEAM, https://www.michigan.gov/pfasresponse/faq/categories/pfas-101 (last accessed Feb. 12, 2024)

[21] Sydney Swanson, *EWG's Healthy Living: Quick Tips to Safer Diapers,* ENV'T WORKING GRP., (Dec. 10, 2020) *available* https://www.ewg.org/research/guide-safer-diapers (last accessed Mar. 5, 2024).

lifespans during which toxic effects might manifest."[22]   Accordingly, the presence of PFAS in the Product is particularly alarming, as it is designed to be used at infancy and through early childhood.

37.      In addition, diapers containing PFAS are cause for concern because "[t]he skin in the area around a baby's genitals is even thinner and more susceptible to exposure to potentially harmful chemicals."[23]   For girls, the presence of PFAS in products coming in contact with vaginal tissue adds further concern.   According to expert Alexandra Scranton, "vaginal or vulvar tissue [is] much different and more sensitive than the skin on the rest of [the] body."[24]   This is because "[t]he walls of the vagina are filled with numerous blood vessels and lymphatic vessels, which allow for direct transfer of chemicals into the circulatory system." [25] Accordingly, "[c]hemicals absorbed through the vagina are easily and effectively distributed throughout the body, without being metabolized."[26]

38.      Moreover, according to Jessica Singh of Columbia University's Mailman School of Public Health, "the vagina is an effective delivery route of drugs to the systemic circulation system, suggesting that it could also effectively deliver other compounds like toxic chemicals, to the circulation."[27]   "This is due to the abundance of arteries, blood and lymphatic vessels in the walls of the vagina mucosa, and the fact the absorption through this route bypasses first-pass

---

[22] Woolf, *supra* note 1.

[23] Sydney Swanson, *supra* note 20.

[24] Alexandra Scranton, *Chem Fatale: Potential Health Effects of Toxic Chemicals in Feminine Care Products*, 9 WOMEN'S VOICES FOR THE EARTH 4 (2013), https://womensvoices.org/wp-content/uploads/2013/11/Chem-Fatale-Report.pdf.

[25] *Id.*

[26] *Id.*

[27] Jessica Singh, et al., *Tampon Use, Environmental Chemicals and Oxidative Stress in the BioCycle Study*, 18:11 ENV'T HEALTH, 1-9, 2 (2019)

metabolism, by directly entering the peripheral circulation."[28]  "For instance, vaginal administration of estradiol results in significantly higher blood serum levels compared to oral administration.  Furthermore, vulvar and vaginal tissues are more hydrated and permeable compared to the skin on the rest of the body, which may make these more susceptible to chemical exposure.  Moreover, in addition to systemic exposure, vaginal exposure to chemicals and drugs can also have local effects on vaginal and cervical tissue."[29]

39.     The health risk to infants and babies using diapers with PFAS chemicals becomes even more alarming when understood how frequently they are exposed to those chemicals through ordinary use.  The American Academy of Pediatrics estimates that "[m]ost U.S. parents will go through nearly 3,000 diapers during their baby's first year alone and average six diaper changes a day for an estimated total of 8,000 over the course of the baby's diaper-wearing career."[30]

40.     For both boys and girls, this repeated, high, and direct skin exposure creates a sever risk to the baby.  For context, researchers studying the effects of *low* level, repeated exposure of certain PFAS chemicals on the skin of rodents showed "significantly reduced levels of antibodies," demonstrating that PFAS had been absorbed through the skin.[31]

---

[28] *Id*.

[29] *Id*.

[30] Laura A. Jana, M.D., FAAP & Jennifer Shu, M.D., FAAP., *Changing Diapers*, AM. ACAD. OF PEDIATRICS (May 19, 2021) *available* https://www.healthychildren.org/English/ages-stages/baby/diapers-clothing/Pages/Changing-Diapers.aspx (last accessed Mar. 11, 2024).

[31] Ketura Persellin, *Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion*, ENV'T WORKING GRP. (Jan. 13, 2020) available https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion.

41.     Accordingly, direct PFAS exposure to infants and babies from Defendant's diapers poses a health risk, the likes of which Plaintiffs and Class Members sought to avoid by purchasing Defendant's plant-based, natural-material Products for their babies.

## IV.   Defendant's Misrepresentations And Omissions Are Actionable

42.     Plaintiffs and Class Members would not have purchased the Product on the same terms had they known the truth about the Product.  At worst, the Product is worthless, as it is marketed as made with natural ingredients, PFAS-free, and safe to use on babies and infants despite testing positive for PFAS chemicals, thus rending the product unsafe for babies and infants.

43.     Plaintiffs and Class Members bargained for diapers that were natural and thereby free of harmful toxins, and were deprived of the basis of their bargain when Defendant sold them a Product containing PFAS.

44.     No reasonable consumer would expect that a diaper marketed as being made from plant-based, natural material would pose a risk to health, safety, and well-being by containing dangerous levels of PFAS chemicals linked to harmful health effects in babies.  Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Product.

45.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Product and to disclose that the Product may contain substances known to have adverse health effects.  Defendant, as manufacturer or party to a contract to manufacture, thereby providing and approving designs of the product, and as seller and advertiser of the Products, is best situated to know the content of its Products. Nonetheless,

Defendant concealed and affirmatively misrepresented the true nature of the Product, as discussed herein.

46.     Likewise, Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe.  Defendant is also best positioned to know of the presence of PFAS in its product, and its failure to disclose the existence of these chemicals in the Product to consumers.

47.     As described herein, Plaintiffs each purchased "The Ultimate Diaper" (the "Purchased Product").  All sizes of the diaper are substantially similar to the Purchased Products Defendant has publicly stated that all sizes of its diapers are "made with the exact same materials and at the same facility as all of [its] diapers."[32]

48.     Plaintiffs have satisfied the requirements of Rule 9(b) by alleging the following facts with particularity:

49.     **WHO**:  Defendant, Kudos, made material misrepresentations and omissions of fact about the Product through labeling, website representations, and marketing statements, which include the representations that Defendant "take[s] pride" in creating "the safest diaper for a baby's sensitive skin," and affirmatively stated that its Products are free from PFAS while simultaneously representing that the Product was comprised of plant-based, natural materials.

50.     **WHAT**:  Defendant's conduct was, and continues to be, fraudulent because it omitted and/or concealed that the Product contains substances—PFAS—that are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Product is safe for children and infants when it is not. Defendant knew or should have known that this information is material to reasonable consumers,

---

[32] Kudos, *supra* note 5.

including Plaintiffs and Class Members in making their purchasing decisions, yet Defendant continued to pervasively market the Product in this manner.

51.    **WHEN**:  Defendant made material misrepresentations and/or omissions during the putative Class periods, including prior to and at the time Plaintiffs and Class Members purchased the Product, despite its knowledge that the Product contains harmful substances.

52.    **WHERE**:  Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Product's packaging, website, and through marketing materials.

53.    **HOW**:  Defendant represented that the Product was made from natural, plant-based materials and affirmatively represented the Product as PFAS-free.  Defendant made material misrepresentations and/or failed to disclose material facts regarding the presence of PFAS in the Product.

54.    **WHY**:  Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase the Product, the effect of which was that Defendant profited by selling the Product.

55.    **INJURY**:  Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Product than they otherwise would have absent Defendant's misrepresentations and/or omissions.

## CLASS ALLEGATIONS

56.    *Nationwide Class.*  Plaintiffs bring this nationwide class action pursuant to rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

All persons in the United States who purchased the Product during the statute of limitations period (the "Class").

57.     Excluded from the Class are: (1) persons who made such purchases for purposes of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiffs' counsel and Defense counsel.

58.     ***California Subclass.***  Plaintiff Deng also seeks to represent a subclass of:

All persons who purchased the Product in the State of California during the statute of limitations period (the "California Subclass").

59.     Excluded from the California Subclass are: (1) persons who made such purchases for purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiffs' counsel and Defense counsel.

60.     As a result of additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate.

61.     ***Numerosity.***  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclass ("Class Members" or "Subclass Members").  However, given the nature of the claims, Plaintiffs believe that Class and Subclass Members are so numerous that joinder of all members is impracticable.

62.     ***Commonality and Predominance.***  There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to

18

members of the Class that predominate over questions that may affect individual Class Members include:

(a) Whether the Product contains PFAS;

(b) Whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

(c) Whether Defendant had a duty to disclose the presence of PFAS in its Products;

(d) Whether the Product posed a health risk to children and babies;

(e) Whether Defendant's conduct was unlawful;

(f) Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

(g) Whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages;

63. With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated California Civil Code § 1750, *et seq.*, California's Consumers Legal Remedies Act; Business & Professions Code § 17500, *et seq.*, California's False Advertising Law; and Business & Professions Code § 17200, *et seq.*, California's Unfair Competition Law.

64. ***Typicality.*** The claims of the named Plaintiffs are typical of the claims of the Classes because the named Plaintiffs, like other members of the Classes, purchased the Product and Defendant's substantially similar Products, relying on the representations and warranties made by Defendant on its packaging and online that the Products were made with natural, plant-based ingredients, and therefore the safest diapers on the market for their babies.

65.     ***Adequate Representation.***  Plaintiffs are adequate representatives of the Class and California Subclass because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

66.     ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation of the Massachusetts Unfair and Deceptive Business Practices Act
Massachusetts General Laws Chapter 93A *et seq.*
(On Behalf Of The Nationwide Class)**

67.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

68.     Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant.

69.     Section 2 of Chapter 93 – the Massachusetts Unfair and Deceptive Business Practices Act ("MUDBPA") – prevents the use of "unfair or deceptive business acts or practices in the conduct of any trade or commerce."  An act is "deceptive" under Chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."  *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991).

70.     It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."  *See* Mass. Gen. Laws Ch. 93A, § 2.

71.     Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper. …  Any person entitled to bring such an action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly situated persons."

72.     Pursuant to the definitions codified in Chapter 93A § 1, Defendant is a "person" and Defendant is engaged in "trade" and "commerce" in Massachusetts, because Defendant resides in Massachusetts and the acts and omissions alleged above and incorporated herein originated from Massachusetts.

73.    By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

74.    Defendant's misrepresentations deceived, and have a tendency to deceive, a reasonable consumer and the general public.

75.    Defendant's acts and omissions are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

76.    Defendant has also committed a violation of MUDBPA predicated on its violation of FTC regulations.  Specifically, by representing that the Product was made with natural, plant-based ingredients, and therefore safe for use on newborns and infants when it was in fact not, Defendant violated FTC regulations.  The foregoing constitutes a *per se* violation of the MUDBPA because MUDBPA explicitly incorporates FTC guidance on what is "unfair or deceptive."

77.    Plaintiffs and the Nationwide Class reasonably relied upon, and were deceived by, Defendant's statements when they purchased the Product.

78.    Defendant knowingly misrepresented that the Product was safe at the time of sale and at all relevant times thereafter.

79.    Had Plaintiffs known that the Product was not safe for babies because of the inclusion of PFAS chemicals, as reasonable consumers and federal regulations define the term, they would not have purchased the Product.

80.    Defendant's misconduct caused Plaintiffs and the Nationwide Class Members to suffer an injury, adverse consequence, or loss because (a) they would not have purchased the

Product on the same terms if the true facts were known about the Product; (b) they paid a price premium for the Product due to Defendant's promises that it was safe: and (c) the Product did not have the characteristics as promised by Defendant.

81.     Plaintiffs and Members of the Nationwide Class have been harmed by this injury, adverse consequence, or loss.

82.     The MUDBPA represents a fundamental public policy of the Commonwealth of Massachusetts.

83.     For each loss, Plaintiffs and each Nationwide Class Member may recover an award of actual damages or twenty-five dollars, whichever is greater.  Ch. 93A § 9(3).

84.     Because Defendant acted willfully or knowingly, Plaintiffs and each Member of the Nationwide Class may recover up to three but not less than two times this amount.  In addition, Plaintiffs may recover attorney's fees and costs.

85.     Plaintiffs and the Members of the Nationwide Class may also seek the imposition of an injunction relief which limits and polices Defendant's representations within or reaching Massachusetts.  The balance of the equities favors the entry of permanent injunctive relief against Defendant.  Plaintiffs, members of the Nationwide Class, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant.  Plaintiffs, Members of the Nationwide Class, and the general public lack an adequate remedy at law.  A permanent injunction against Defendant is in the public interest.  Defendant's unlawful behavior is capable of repetition or reoccurrence absent the entry of a permanent injunction.

86.     In accordance with Massachusetts General Laws Chapter 93A, § 9(3) on February 5, 2024, prior to the filing of this Complaint, Defendant received from Plaintiffs' counsel a pre-suit notice letter, apprising Defendant of its breach of warranties regarding the Product.  The

letter was sent via certified mail, return receipt requested.  The letter stated that it was sent on

behalf of Plaintiffs and all other similarly situated purchasers.  Defendant did not make any

changes to the Product and did not pull the Product from the marketplace.

<u>**COUNT II**</u>
**Violation of California's Unfair Competition Law,**
**California Business & Professions Code § 17200,** *et seq.*
**(On Behalf Of The California Subclass)**

87.     Plaintiff Deng incorporates the foregoing allegations as if fully set forth herein.

88.     Plaintiff Deng brings this claim individually and on behalf of the California

Subclass against Defendant.

89.     California Business and Professions Code § 17200 prohibits "any unlawful,

unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has

engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California

Business & Professions Code § 17200.

90.     By committing the acts and practices alleged herein, Defendant has violated

California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to

the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

91.     Defendant has violated the UCL's proscription against engaging in **<u>Unlawful</u>**

**<u>Business Practices</u>** because of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7),

and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of

California's False Advertising Law, in addition to breach of warranty and violations of common

law.

92.     As more fully described above, Defendant's misleading marketing, advertising,

packaging, and labeling of the Product is likely to deceive reasonable consumers.  In addition,

Defendant has committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

93.    Plaintiff Deng and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

94.    Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

95.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

96.    Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures, and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

97.    Plaintiff Deng and the other California Subclass Members suffered a substantial injury by virtue of buying the Product that they would not have purchased, or paying more than they otherwise would have for the Product, absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

98.    There is no benefit to consumers or competition from deceptively marketing and omitting materials facts about the true nature of the Product.

99.     Plaintiff Deng and the other California Subclass Members had no way of reasonably knowing that the Product they purchased was not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

100.    The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immortal, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff Deng and the other California Subclass Members.

101.    Pursuant to California Business and Professional Code § 17203, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to Plaintiff Deng and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff Deng's and the California Subclass's attorneys' fees and costs.

### <u>COUNT III</u>
### Violation of California's Consumer Legal Remedies Act ("CLRA"),
### California Civil Code § 1750, *et seq.*
### (On Behalf Of The California Subclass)

102.    Plaintiff Deng incorporates the foregoing allegations as if fully set forth herein.

103.    Plaintiff Deng brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

104.    California Civil Code § 1770(a)(5) prohibits "[r]representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…."

105.     California Civil California Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

106.     California Civil Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

107.     Defendant violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9) by marketing that the Product is safe, when in fact the Product is not safe for its intended use.

108.     Defendant's representations are untrue because testing of the Product showed heightened levels of PFAS.  Thus, Defendant cannot represent the product as being safe because it contains PFAS that subject unsuspecting consumers' children to significant health risks.

109.     Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiffs or the California Class Members.

110.     Defendant made partial representations to Plaintiff Deng and the California Subclass Members, while suppressing the true nature of the Product.  Specifically, by representing the Product as safe including on the Product packaging, on its website, and in its marketing, without disclosing that the Product is unsafe and detrimental to human health.  As described above, Defendant was in receipt of knowledge pertaining to PFAS in its Product, and yet has continued to omit that material information from consumers.

111.     Plaintiff Deng and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for a Product that they otherwise would not have incurred or paid for had they known the truth about the Product, and unknowingly exposed their children to a health risk.

112.    On February 5, 2024, prior to the filing of this Complaint, Defendant received a CLRA notice letter from Plaintiffs' counsel, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant has not taken any corrective action in response to the letter.

113.    Accordingly, Plaintiff Deng and the California Subclass Members seek all available relief under the CLRA, including restitution, damages, injunctive relief, the payment of costs and attorney's fees, and any other relief deemed appropriate and proper by the Court.

**COUNT IV**
**Violation of California's False Advertising Law ("FAL")**
**California Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf Of The California Subclass)**

114.    Plaintiff Deng incorporates the foregoing allegations as if fully set forth herein.

115.    Plaintiff Deng brings this claim individually and on behalf of the California Subclass against Defendant.

116.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive California Subclass Members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Product as free from harmful chemicals and thus safe for infants and babies, when in fact, the Product was not safe because of its inclusion of PFAS chemicals.

117.    By its actions, Defendant disseminated uniform advertising regarding the Product to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California Business & Professions Code § 17500, *et seq.*  Such

28

advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

118.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Product contains substances that pose a significant risk to the health and well-being of Plaintiff Deng and the California Subclass Members.

119.     Defendant continues to misrepresent to consumers that the Product is safe for its intended use.  However, as described, that is not the case.

120.     In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff Deng and other California Subclass Members based their purchasing decisions on Defendant's misrepresentation and omissions of material facts.  Plaintiff Deng and California Subclass Members were injured in fact and lost money and property as a result.

121.     The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of California Business & Professions Code § 17500, *et seq.*

122.     As a result of Defendant's wrongful conduct, Plaintiff Deng and California Subclass Members lost money in an amount to be proven at trial.  Plaintiff Deng and California Subclass Members are therefore entitled to restitution as appropriate for this cause of action.

123.     Plaintiff Deng and California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees

and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

124.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the PFAS in the Product and its effects; or (2) the removal of such chemicals from the Product, will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of the Product absent omissions and misrepresentations with the full purchase price at their disposal.

**<u>COUNT V</u>**
**Breach Of Implied Warranty Under The Song-Beverly Act**
**California Civil Code § 1700, *et seq.* And California Commercial Code § 2314**
**(On Behalf Of The California Subclass)**

125.    Plaintiff Deng incorporates the foregoing allegations as if fully set forth herein.

126.    Plaintiff Deng brings this claim individually and on behalf of the California Class against Defendant under California law.

127.    Under the Song-Beverly Consumer Warranty Act, California Civil Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

128.   The Product at issue here falls under "consumer goods" within the meaning of California Civil Code § 1791(a).

129.   Plaintiff Deng and the California Class Members who purchased the Product are "retail buyers" within the meaning of California Civil Code § 1791.

130.   Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Product to retail buyers, and therefore is a "manufacturer" and "seller" within the meaning of California Civil Code § 1791.

131.   Defendant impliedly warranted to retailer buyers that the Product was merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Product us used. For a consumer good to be "merchantable" under the Act, it must satisfy both elements. Defendant breached these implied warranties because the Product is unsafe for use on babies. Therefore, the Product would not pass without objection in the trade or industry and is not fit for the ordinary purpose for which it is used.

132.   Plaintiff Deng and California Subclass Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging, labeling, and marketing the Product.

133.   The Product was defective at the time of sale when it was under the exclusive control of Defendant.  The issues described in this complaint were latent in the Product and not reasonably discoverable at the time of sale.

134.   Defendant knew that the Product would be purchased and used without additional testing by Plaintiff Deng and California Subclass Members.

135.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff Deng and California Subclass Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that it is unfit for use and posed a significant safety risk.

136.     Plaintiff Deng and the California Subclass seek compensatory damages, attorneys' fees, costs, and any other just and proper relief available under law.

**COUNT VI**
**Fraud**
**(On Behalf Of The Nationwide Class)**

137.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

138.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class under Massachusetts law.

139.     Defendant falsely represented to Plaintiffs and the Nationwide Class that the Product was safe.

140.     Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Nationwide Class to purchase the Product.

141.     Defendant knew or should have known that its representations about the Product were false in that the Product is not safe as discussed throughout.

142.     Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Nationwide Class.

143.     Plaintiffs and the Nationwide Class did in fact rely on these misrepresentations and purchased the Product to their detriment.  Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Product, Plaintiffs' and the Nationwide Class's reliance on Defendant's misrepresentations was justifiable.

144.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Nationwide Class have suffered actual damages in that they would not have purchased the Product at all had they known of the safety risks associated with the Product and that they do not conform to the Product's labels, packaging, advertising, and statements.

145.     Plaintiffs and the Nationwide Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

**COUNT VII**
**Fraudulent Concealment Or Omission**
**(On Behalf Of The Nationwide Class)**

146.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

147.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class under Massachusetts law.

148.     At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Product.

149.     Defendant, acting through its representatives or agents, delivered the Product to its distributors and various other distribution channels.

150.     Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Product as discussed throughout.

151.     Rather than inform consumers of the truth regarding the Product, Defendant misrepresented the quality of the Product as discussed herein at the time of purchase.

152.     Defendant made these material misrepresentations to boost or maintain sales of the Product, and to falsely assure purchasers of the Product that Defendant is a reputable company and that its Product is safe for use.  The false representations were material to consumers because the omissions played a significant role in the value of the Product purchased.

153.    Plaintiffs and Nationwide Class Members accepted the terms of use, which were silent on the true nature of the Product, as discussed throughout.  Plaintiffs and Nationwide Class Members had no way of knowing Defendant's omissions as to the Product and had no way of knowing that Defendant's omissions were misleading.

154.    Although Defendant had a duty to ensure the safety, completeness, and accuracy of the information regarding the Product, it did not fulfill these duties.  Nor did Defendant fulfill its duty stemming from its incomplete partial representations.

155.    Defendant omitted or concealed material facts partly to pad and protect its profits, as it saw that profits and sales of the Product were essential for its continued growth and to maintain and grow its reputation as a seller of the Product.  Such benefits came at the expense of Plaintiffs and Nationwide Class Members.

156.    Plaintiffs and Nationwide Class Members were unaware of these material omissions, and they would not have acted as they did, had they known the truth.  Plaintiffs' and the Nationwide Class Members' actions were justified given Defendant's omissions.  Defendant was in the exclusive / superior control of material facts, and such facts were not widely known to the public.

157.    Due to Defendant's misrepresentations, Plaintiffs and Nationwide Class Members sustained injury due to the purchase of the Product that did not live up to its advertised representations.  Plaintiffs and Nationwide Class Members are entitled to recover full refunds for the Product they purchased due to Defendant's omissions.

158.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Nationwide Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were

done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### COUNT VIII
**Negligent Misrepresentation**
**(On Behalf Of The Nationwide Class)**

159.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

160.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class under Massachusetts law.

161.   Defendant had a duty to Plaintiffs and the Nationwide Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Product.

162.   Defendant breached its duty to Plaintiffs and the Nationwide Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiffs and the Nationwide Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Product from the marketplace or take other appropriate remedial action.

163.   Defendant knew or should have known that the qualities and characteristics of the Product was not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Product was not safe for use.

164.   Plaintiffs and Nationwide Class Members were unaware of these facts, and they would not have acted as they did, had they known the truth.  Plaintiffs' and the Nationwide Class Members' actions were reasonable given the information they had.

165.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Nationwide Class have suffered actual damages in that they would not have purchased the Product at all had they known that the Product was not safe for use and that the Product does not conform to the labeling, packaging, advertising, and statements.

166.     Plaintiffs and the Nationwide Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

<u>**COUNT VIIII**</u>
**Unjust Enrichment**
**(On Behalf Of The Nationwide Class)**

167.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

168.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class under Massachusetts law.

169.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

170.     Plaintiffs and the Nationwide Class Members conferred benefits on Defendant by purchasing the Product.

171.     Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and the Nationwide Class Members' purchases of the Product.  Retention of those monies under these circumstances is unjust and inequitable because Defendant misrepresented and failed to disclose that the Product was unfit for its intended purpose as it was not safe for use.  These omissions and misrepresentations caused injuries to Plaintiffs and the Nationwide Class Members because they would not have purchased the Product if the true facts were known.

172.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Nationwide Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

173.    Here, equitable relief in the form of non-restitutionary disgorgement of profits is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs and the Nationwide Class Members would be left without the parity in purchasing power to which they are entitled.

174.    Non-restitutionary disgorgement of profits may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiffs and the Class Members are in the same place they would have been in had Defendant's wrongful conduct not occurred, *i.e.*, the position to make an informed decision about the purchase of the Product absent omissions and misrepresentations with the full purchase price at their disposal.

## COUNT X
### Breach Of Express Warranty
### (On Behalf Of The Nationwide Class)

175.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

176.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class under Massachusetts law.

177.    Plaintiffs and Nationwide Class Members formed a contract with Defendant at the time Plaintiffs and Nationwide Class Members purchased the Product.

178.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

179.    This labeling, marketing, and advertising constitutes express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Nationwide Class Members.

180.    As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for their intended use.

181.    Plaintiffs and Nationwide Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

182.    Defendant breached express warranties about the Product and its qualities because despite Defendant's warranties that the Product is safe for use, the Product is objectively not safe for use.  Thus, the Product did not confirm to Defendant's affirmations and promises described above.

183.    Plaintiffs and each Nationwide Class Member would not have purchased the Product had they known the true nature of the Product.

184.    As a result of Defendant's breach of express warranty, Plaintiffs and each Nationwide Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

<u>**COUNT XI**</u>
**Negligent Failure To Warn**
**(On Behalf Of The Nationwide Class)**

185.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

186.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class under Massachusetts law.

187.    At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product.  At all relevant times, it was reasonably foreseeable by Defendant that the use of the

Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiffs' children and the Nationwide Class as the ultimate users of the Product.

188.   At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiffs and Nationwide Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

189.   Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiffs and the Nationwide Class of all dangers associated with the intended use of the Product.

190.   At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

191.   Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Product, including Plaintiffs and the Nationwide Class, regarding the true nature of the Product, its risks, and potential dangers.

192.   Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Product contain PFAS known to cause adverse health effects in children.

193.   Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Product as described herein, and knew that Plaintiffs and Nationwide Class Members could not reasonably be aware of those risks.  Defendant failed to exercise reasonable care in providing Plaintiffs and the Nationwide Class with adequate warnings.

194.    As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Product, including its intended use, could cause and has cause injuries and other damages, Plaintiffs and the Nationwide Class have suffered damages, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendant as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel;

(b)    For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class and Subclass  on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and;

(h)    For an order awarding Plaintiffs and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: April 2, 2024                    Respectfully submitted,


**SMITH KRIVOSHEY, P.C.**

By: */s/ Joel D. Smith*
        Joel D. Smith

Joel D. Smith (BBO 712418)
867 Boylston Street, 5th Floor #1520
Boston, MA 02116
Telephone: (617) 377-7404
Email: joel@skclassactions.com


**BURSOR & FISHER, P.A.**


By: */s/ L. Timothy Fisher*
        L. Timothy Fisher

L. Timothy Fisher (*pro hac vice* forthcoming)
Joshua R. Wilner (*pro hac vice* forthcoming)
Joshua B. Glatt (*pro hac vice* forthcoming)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  ltfisher@bursor.com
            jwilner@bursor.com
            jglatt@bursor.com

*Attorneys for Plaintiffs*